# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 14, 2013 Session

## FIRST COMMUNITY BANK, N.A. V. FIRST TENNESSEE BANK, N.A., ET. AL.

**Appeal from the Circuit Court for Knox County**
**No. 347511     Hon. Wheeler A. Rosenbalm, Judge**

---

**No. E2012-01422-COA-R3-CV - Filed August 20, 2013**

---

Plaintiff brought this action against Defendants for fraud, constructive fraud, negligent misrepresentation, civil conspiracy, unjust enrichment, and violation of the Tennessee Securities Act, codified at Tennessee Code Annotated section 48-1-101, et seq. The claims arose out of the purchase of asset-backed securities. Defendants filed motions to dismiss for failure to state a claim, while Nonresident Defendants also objected to the court's personal jurisdiction. The court dismissed the complaint as requested for failure to state a claim and for lack of personal jurisdiction. Plaintiff appeals. We affirm the dismissal of the complaint for lack of personal jurisdiction as to Nonresident Defendants but reverse the dismissal of the complaint for failure to state a claim as to the remaining defendants. We remand for proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, J., and D. KELLY THOMAS, JR., SP.J.,[1] joined.

Lawrence F. Giordano and Linda J. Hamilton Mowles, Knoxville, Tennessee, and Daniel P. Lynch and William J. Wyrick, Cranberry Township, Pennsylvania, for the appellant, First Community Bank f/k/a First Community Bank, N.A.

Mark D. Griffin, Lori H. Patterson, and Kristine L. Roberts, Memphis, Tennessee, for the appellees, First Tennessee Bank, N.A. d/b/a FTN Capital Markets and FTN Financial Securities Corporation.

---

[1] Judge on the Court of Criminal Appeals sitting by special designation.

Thomas K. Potter, III, and Lauren E. Kilgore, Nashville, Tennessee, for the appellee, Morgan Keegan & Company, Inc.

H. Frederick Humbracht, Jr., Nashville, Tennessee, and Roger A. Cooper and Jared Gerber, New York, New York, for the appellee, Bank of America Corporation as successor in interest to Merrill Lynch, Pierce, Fenner & Smith, Inc.

W. Kyle Carpenter, Knoxville, Tennessee, and Floyd Abrams, Tammy L. Roy, and Philip V. Tisne, New York, New York, for the appellee, The McGraw-Hill Companies, Inc. d/b/a Standard & Poor's Ratings Services.

W. Brantley Phillips, Jr., Nashville Tennessee, and Mark P. Gimbel and Colin P. Watson, New York, New York, for the appellee, Trapeza Capital Management, LLC.

Dwight E. Tarwater and Taylor A. Williams, Knoxville, Tennessee, and Joshua M. Rubins, James J. Coster, and David R. Lurie, New York, New York, for the appellee, Moody's Investors Services, Inc.

Bernard E. Bernstein, Knoxville, Tennessee, and Martin E. Flumenbaum, Roberta A. Kaplan, Frank D. D'Angelo, James J. Beha, II, and Jacob H. Hupart, New York, New York, for the appellee, Fitch, Inc. d/b/a Fitch Ratings.

John A. Lucas and Lane E. McCarty, Knoxville, Tennessee, and Michael T. Reynolds and Kevin J. Orsini, New York, New York, for the appellees, J.P. Morgan Securities, LLC, individually and as successor in interest to Bear Stearns & Company, Inc.

John E. Winters and John T. Johnson, Knoxville, Tennessee, Stephen L. Polk and Bryan M. Ward, Atlanta, Georgia, for the appellee, SunTrust Robinson Humphrey, Inc. f/k/a SunTrust Capital Markets, Inc.

James A. Holifield, Jr., Knoxville, Tennessee, and Eric R. Levine and Eric P. Heichel, New York, New York, for the appellee, Keefe, Bruyette & Woods, Inc.

Andrew Colocotronis, Knoxville, Tennessee, and Ripley Hastings, Stephen M. LaRose, and Danielle M. McLaughlin, Boston, Massachusetts, for the appellees, Preferred Term Securities X, Inc.; Preferred Term Securities X, Ltd.; Preferred Term Securities XII, Inc.; Preferred Term Securities XII, Ltd.; Preferred Term Securities XIII, Ltd.; Preferred Term Securities XIV, Inc.; Preferred Term Securities XIV, Ltd.; Preferred Term Securities XVI, Inc.; Preferred Term Securities XVI, Ltd.; Preferred Term Securities XXII, Inc.; Preferred Term Securities XXII, Ltd.; Preferred Term Securities XXII, Inc.; Preferred Term Securities XXIII, Ltd.; Preferred Term Securities XXVI, Inc.; Preferred Term Securities XXVI, Ltd.; Soloso

CDO 2007-1, Inc.; Soloso CDO 2007-1, Ltd.; Trapeza CDO XIII, Inc.; and Trapeza CDO XIII, Ltd.

## OPINION

## I. BACKGROUND

First Community Bank[2] ("Plaintiff") is a banking and financial services company that is incorporated in Virginia. Plaintiff has more than 50 financial centers located in various states, including Virginia, West Virginia, North Carolina, and Tennessee. In 2003, Plaintiff began investing in asset-backed securities, namely collateralized debt obligations ("CDOs") and residential mortgage-backed securities ("RMBSs"). CDOs are an amalgam of different forms of debt that are pooled together, regrouped into classes ("tranches"), assigned a rating, and marketed to investors. Ideally, investors who purchase a tranche in a CDO receive a steady influx of payments and eventually recoup the investment in addition to a profit.

In 2000, FTN Financial Securities Corporation ("FTN"), a wholly owned subsidiary of First Tennessee Bank, N.A. ("FTB"), along with Keefe, Bruyette & Woods, Inc. ("KBW") developed pooled trust preferred CDOs, entitled Preferred Term Securities ("PreTSLs"). PreTSLs were comprised of portfolios of debt issued by banks, insurance companies, and real estate investment subsidiaries. FTN and KBW formed entities ("PreTSL Entities") to serve as the issuer or co-issuer of the asset-backed securities. From 2003 to 2007, Plaintiff purchased notes in varying tranches in seven of the PreTSLs formed by FTN and KBW.

In June 2007, Plaintiff purchased notes in the A-3L tranche of a CDO, entitled Soloso 2007-1 ("Soloso"). The next day, Plaintiff purchased additional notes from the same tranche. Bear Stearns & Company, Inc. ("Bear Stearns") and SunTrust Robinson Humphrey, Inc. ("SunTrust") structured Soloso and created special purpose entities, Soloso CDO 2007-1, Ltd. and Soloso CDO 2007-1, Inc. ("Soloso Entities"), to serve as issuer and co-issuer of Soloso. One month later, Plaintiff purchased notes in the D tranche of a CDO, entitled Trapeza CDO XIII ("Trapeza"). J.P. Morgan Securities, LLC ("JP Morgan"),[3] along with Morgan Keegan & Company, Inc. ("Morgan Keegan") structured Trapeza and created special purpose entities, Trapeza CDO XIII, Ltd. and Trapeza CDO XIII, Inc. ("Trapeza Entities"), to serve as issuer and co-issuer of Trapeza. Trapeza Capital Management, LLC ("TCM") served as a collateral manager and assisted in the selection and management of the securities.

Unlike CDOs, RMBSs are securities "backed by a pool of residential mortgage loans" and grouped into tranches. The recoupment of the purchase price and any profit are

---

[2] Plaintiff is a wholly owned subsidiary of First Community Bancshares, Inc.

[3] Formally known as J.P. Morgan Securities, Inc.

dependent upon the viability of each underlying mortgage's rates of return and default. On December 22, 2006, Plaintiff purchased notes in the A-9 tranche of Residential Asset Securitization Trust 2006-A9CB ("RAST"), which was backed by 2,016 mortgages. The mortgages were acquired by IndyMac Bank, F.S.B. ("Indy")[4] and marketed by Indy and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch").

Each sale, whether for a CDO tranche or the RMBS tranche, was conditioned upon the receipt of a minimum rating by one of three rating organizations, Moody's Investor Services, Inc. ("Moody's"); Fitch, Inc. doing business as Fitch Ratings ("Fitch"); and The McGraw-Hill Companies, Inc. ("McGraw-Hill") doing business as Standard & Poor's Ratings Services ("S&P").[5] The products were rated as follows:

| Product | Purchase Price | Moody's | Fitch | S&P |
| --- | --- | --- | --- | --- |
| PreTSL X | $10,000,000 | A2 | A | No rating |
| PreTSL XII | $10,000,000 | A2 | A | No rating |
| PreTSL XII | $10,417,695.61 | A2 | A | No rating |
| PreTSL XIV | $9,335,790 | A2 | A | No rating |
| PreTSL XVI | $4,119,326.67 | A2 | A | No rating |
| PreTSL XXIII | $8,180,712.21 | A3 | A | No rating |
| PreTSL XXII | $12,785,606.03 | A3 | A- | No rating |
| PreTSL XXVI | $7,000,000 | A3 | A- | No rating |
| Trapeza | $20,000,000 | No rating | A- | No rating |
| Soloso | $18,400,000 | A2 | A- | No rating |
| RAST | $25,000,000 | Aaa | No rating | AAA |

Each product received the required minimum rating. Specifically, the ratings from Moody's, Fitch, and S&P (collectively "Rating Agencies") represented that each security was "upper-medium grade" and "subject to low credit risk" according to Moody's, of "high credit quality" and "low default risk" with a "strong" capacity for repayment according to Fitch, and of "[e]xtremely strong capacity to meet financial commitments" according to S&P.

---

[4] OneWest Bank, F.S.B. as successor in interest to Indy has since been removed as a party.

[5] S&P was not registered as a nationally recognized statistical rating organization until September 2007.

In order to finance the transactions, Plaintiff borrowed from other sources by aligning the repayment terms with the anticipated income of principal and interest from its newly-purchased investments. In August 2008, Moody's downgraded the rating for a number of Plaintiff's investments. "Beginning in the fourth quarter of 2008, some" of the investments "began to fail certain coverage tests" and began to "pay in kind, crippling their fair market value." Plaintiff eventually sold its CDOs. The following table represents Moody's revised ratings and sale price, if applicable:

| Product | Purchase Price | Sale Price | Revised Rating |
|---|---|---|---|
| PreTSL X | $10,000,000 | $1,106,000 | Ca |
| PreTSL XII (both products) | $20,417,695.61 | $3,262,000 | Ca |
| PreTSL XIV | $9,335,790 | $1,314,900 | Ca |
| PreTSL XVI | $4,119,326.67 | $3,000.41 | Ca |
| PreTSL XXII | $12,785,606.03 | $238,750 | Ca |
| PreTSL XXIII | $8,180,712.21 | $990,000 | C |
| PreTSL XXVI | $7,000,000 | $2,499 | C |
| Trapeza | $20,000,000 | $2,500 | Not rated by Moody's |
| Soloso | $18,400,000 | $2,500.56 | C |
| RAST | $25,000,000 | | A2 |

Plaintiff retained its investment in RAST, despite a significant downgrade in its rating and breaches in various "coverage tests." In total, Plaintiff lost approximately $100,000,000 as a result of the downgrade in the overall value of its CDOs. In order to recover from the massive loss, Plaintiff cut shareholder dividends, froze salaries, and scaled back plans for expansion and growth to the detriment of its shareholders, employees, and customers.

On September 15, 2011, Plaintiff filed a 207-page complaint, alleging fraud and negligent misrepresentation against the Rating Agencies; the PreTSL Entities, the Soloso Entities, and the Trapeza Entities (collectively "Issuing Entities"); and FTN, KBW, Morgan Keegan, TCM, SunTrust, Bank of America Corporation ("BOA") as successor in interest to

Merrill Lynch,[6] and JP Morgan, individually and as successor in interest to Bear Stearns[7] (collectively "Placement Agents").[8] Plaintiff brought claims for violation of the Tennessee Securities Act ("TSA") and unjust enrichment against Placement Agents and Issuing Entities.

In general, Plaintiff alleged that Placement Agents and Issuing Entities worked with Rating Agencies in producing products that appeared marketable and that Rating Agencies were retained and compensated based upon the rating it provided. Plaintiff claimed that Placement Agents and Issuing Entities then knowingly provided the misleading rating to secure the sale of the products.

In support of its claim for fraud, Plaintiff claimed that Placement Agents, Issuing Entities, and Rating Agencies (collectively "Defendants") "made materially false and misleading representations and omissions" relative to the products, the underwriting and rating process, the adequacy of the credit support and enhancement available, conflicts of interest with Rating Agencies, and whether Rating Agencies had "sufficiently reliable facts and sufficiently reliable models on which to assign" ratings. Plaintiff also specifically alleged that those involved in the PreTSL and Soloso transactions made materially false and misleading representations concerning the subscription of the products. Plaintiff asserted that Defendants "made the representations and omissions either knowing of their falsity or with recklessness as to whether the representations were false," that its reliance upon the representations and omissions was reasonable and justifiable, and that it suffered damages as a result of the "fraudulent conduct, misrepresentations, and omissions."

In support of its claim for negligent misrepresentation, Plaintiff alleged that Placement Agents and Issuing Entities "supplied materially false, faulty and misleading information" in an attempt to guide Plaintiff in its business transactions, that Defendants "failed to exercise reasonable care in obtaining and communicating the information" concerning the quality of the notes, that it was foreseeable, reasonable, and justifiable that Plaintiff would rely on the information, and that Plaintiff suffered damages as a result of its reliance. Plaintiff further alleged that Rating Agencies also "supplied materially false, faulty and misleading" information and credit ratings, that Rating Agencies "held special expertise" and "had a duty to conduct a reasonable investigation of the truthfulness of its representations regarding" the ratings, that it was foreseeable, reasonable, and justifiable that Plaintiff would rely on the information, and that Plaintiff suffered damages as a result of its reliance.

---

[6]BOA purchased Merrill Lynch in 2008.

[7]JP Morgan purchased Bear Stearns in 2008.

[8]Originally, Plaintiff filed claims against S&P for each transaction. All but one of the claims were eventually dismissed in recognition of the fact that S&P only rated RAST.

In support of its TSA claim against Placement Agents and Issuing Entities, Plaintiff alleged that Placement Agents and Issuing Entities

(a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit[.]

Plaintiff asserted that it suffered damages as a result of the "false and fraudulent conduct, misrepresentations, and omissions."

In support of its claim for unjust enrichment, Plaintiff alleged that it conferred a benefit upon Placement Agents and Issuing Entities for the purchase of the products and that they appreciated and accepted the benefit "under such circumstances that it would be inequitable and unjust" to allow retention of "the benefit without payment of value."

SunTrust and BOA filed motions to sever. Defendants sought dismissal, alleging that Plaintiff had failed to state a claim upon which relief could be granted because the claims were time-barred, because Plaintiff failed to plead its fraud-based claims with particularity, because Plaintiff failed to identify a material misstatement upon which it reasonably relied, because the securities were not purchased in Tennessee, and because the losses were caused by general market conditions. Placement Agents claimed they had not sold the securities or issued the offering materials. BOA argued that Plaintiff had not pled any facts concerning successor liability. Rating Agencies asserted that Plaintiff's claims were preempted by the Credit Rating Agency Reform Act of 2006 ("the CRARA") and that the ratings were protected by the First Amendment to the United States Constitution.

Issuing Entities, Rating Agencies, and TCM ("Nonresident Defendants") asked the court to dismiss Plaintiff's complaint for lack of personal jurisdiction, alleging that Plaintiff was a Virginia corporation and that Plaintiff's cause of action did not arise from and was not related to any activities that occurred in Tennessee. Nonresident Defendants attached affidavits in support of each motion.

Issuing Entities asserted that each entity was either a Delaware corporation or an exempted company organized under the laws of the Cayman Islands. Donald Puglisi, Wendy Ebanks, Carrie Bunton, and Andrew Dean submitted affidavits in support of the motion to dismiss. Mr. Puglisi, director of each of the nine co-issuer defendants; Ms. Ebanks, director of Trapeza CDO XIII, Ltd.; Ms. Bunton, director of the seven PreTSL issuer defendants; and Mr. Dean, director of Soloso CDO 2007-1, Ltd., declared that Issuing Entities did not have a place of business in Tennessee, did not regularly conduct or solicit business in Tennessee,

and did not possess any property in Tennessee.  They claimed that Issuing Entities had not "actively participated in selecting the underlying assets, structuring the tranches of notes, or marketing and selling to investors the notes at issue."

S&P attached supporting affidavits from M. Scott Mason and Janet R. Sacks.  Mr. Mason asserted that the ratings relevant to this case were "issued out of New York" by analysts who "were not based out of Tennessee."  Ms. Sacks claimed that McGraw-Hill was incorporated under the laws of New York and had its principal place of business in New York.  She stated that McGraw-Hill did not maintain a bank account in Tennessee but conceded that McGraw-Hill was authorized to transact business in Tennessee, had an agent responsible for receiving service of process in Tennessee, reported $59 million in revenue derived from Tennessee sales, employed 48 persons in Tennessee, and leased 17,800 square feet of office space in Tennessee.  She claimed that S&P did not have an agent responsible for receiving service of process, was not authorized to transact business in Tennessee, and did not employ any personnel in Tennessee.

Fitch, a Delaware corporation with its principal place of business in New York, attached a supporting affidavit from Melanie Stein, who claimed that Fitch was not registered to transact business in Tennessee, had no agent for service of process in Tennessee, did not own or rent real property in Tennessee, and did not possess assets, bank accounts, post office boxes, offices, or other facilities in Tennessee.  She acknowledged that employees occasionally traveled to Tennessee for business and that it derived 1.1 percent of its United States income and 0.5 percent of its global income "from rating the securities of issuers based in Tennessee."  She said that the ratings relevant to this case were not issued in Tennessee.

In support of its motion, Moody's, a Delaware corporation with its principal place of business in New York, asserted that there was no basis for general or specific jurisdiction when it had no presence in Tennessee and did not commit any misconduct in Tennessee. Moody's conceded that it might have issued offering materials that could have been circulated in Tennessee but claimed that it had not purposefully established any potentially relevant contacts with Tennessee.  Moody's issued a supporting affidavit from William Tice, a senior tax manager for Moody's.  Mr. Tice claimed that Moody's

> [was] not registered to do business in Tennessee; ha[d] no subsidiary companies that [were] registered to do business in Tennessee; [did not own or lease] real property in Tennessee; [did] not pay taxes in Tennessee; ha[d] no employees or agents in Tennessee; ha[d] no bank accounts in Tennessee; and ha[d] no post office boxes in Tennessee.

In support of its motion, TCM, a Delaware limited liability company, likewise asserted that it was neither incorporated nor licensed to do business in Tennessee, had no

offices or employees in Tennessee, and was not alleged to have engaged in any conduct in Tennessee. TCM attached a supporting affidavit from Jeffrey Blomstrom, managing director of TCM. Mr. Blomstrom attested that TCM had offices in New York and Ohio and that its activities principally took place in those two states. He asserted that TCM did not participate in the marketing of any of the securities or distribution of offering materials and that its work was performed pursuant to a collateral management agreement and an indenture agreement, which did not give TCM reason to believe that it would be subject to suit in Tennessee.

On February 16, 2012, Plaintiff filed a motion for leave to take limited discovery on the issue of personal jurisdiction and sought to hold oral arguments in abeyance. Plaintiff filed an amended complaint, along with interrogatories, requests for production of documents, and notices of deposition. Defendants objected to the discovery requests and filed renewed motions to dismiss. Nonresident Defendants either filed motions to quash or requested a protective order to prevent discovery. The rest of the defendants objected to any discovery that did not pertain to jurisdictional issues and sought timely oral argument on their respective motions to dismiss.

Plaintiff's amended complaint, which spanned 260 pages, added claims of civil conspiracy and constructive fraud against Defendants and a claim of unjust enrichment against Rating Agencies for the payment received for rating each product. In addition to pleading jurisdictional facts in support of general and specific jurisdiction over Nonresident Defendants, Plaintiff alleged that personal jurisdiction was appropriate because of their "involvement in a civil conspiracy involving Tennessee co-conspirators [that] involved substantial acts in furtherance of the conspiracy in Tennessee." Plaintiff alleged that the products were "sold in Tennessee through conduct occurring in Tennessee." The offering materials for the PreTSLs and Trapeza CDO provided that several of the underlying securities were purchased from entities within Region 2, which included Tennessee. Likewise, RAST included 13 mortgages from Tennessee and directed investors to surrender certificates for transfer or exchange at an office in Nashville, Tennessee.

Plaintiff alleged that Defendants were guilty of civil conspiracy because they "omitted numerous material facts in connection with the issuance, rating, marketing and sale" of each product "for the purpose of defrauding" Plaintiff and others. Plaintiff relied upon the "material misrepresentations and omissions made by" those "acting in concert and in furtherance of the conspiracy" for each product. Plaintiff asserted that Defendants were guilty of constructive fraud because they "owed a legal and/or equitable duty" to Plaintiff "to provide accurate and complete information orally and in written communications" but that each defendant "made the false representations and omissions knowing they were not accurate or complete." Relative to the unjust enrichment claim, Plaintiff alleged that it conferred "an indirect benefit in the amount of the fees paid to [] Rating Agencies out of [Plaintiff's] purchase price proceeds" and that Rating Agencies appreciated and accepted the

benefit under "circumstances that it would be inequitable and unjust for it to retain the benefit without payment."

Plaintiff also added general allegations and facts in its amended complaint. Plaintiff claimed that FTN and KBW repurchased investments from investors and then sold them in order to create the appearance of short-term profits and secondary market liquidity. Plaintiff relied upon KBW's representations of secondary market liquidity in making its purchases.

Plaintiff asserted that Rating Agencies participated in the structuring of the products and selection of the securities in order to ensure that the products received an "investment grade" rating. Plaintiff knew of the "issuer pays" model but claimed that it did not know the extent to which the inherent conflict created misleading and inaccurate ratings. Plaintiff relied upon the ratings and "believed that [it had paid] to ensure that the Rating Agencies properly evaluated the investment risk." Plaintiff retained its interest, in part, "in reliance upon [] representations that [] Rating Agencies and [TCM] were continuing to evaluate the underlying securities and would warn them if the risk of default increased." Plaintiff claimed that Rating Agencies knew that the modeling and historical assumptions used in rating the products were inadequate and that they purposefully delayed downgrading the ratings. Plaintiff asserted that in an effort to confuse investors, Rating Agencies assured the public that the price collapse "had been caused by lax loan underwriting of which they did not know and could not have learned when they issued their credit ratings."

In the renewed motions to dismiss, Defendants asserted anew that Plaintiff failed to state any claims upon which relief could be granted. Defendants responded to the new claims of civil conspiracy by asserting that Plaintiff failed to plead sufficient facts constituting tortious conduct or a relationship that would support a conspiracy claim. Defendants responded to the new claim of constructive fraud by asserting that Plaintiff failed to plead sufficient facts demonstrating that they owed Plaintiff a legal or equitable duty, that they misrepresented or concealed material facts, or that Plaintiff relied upon any alleged misrepresentations or omissions. Nonresident Defendants also renewed their objections to personal jurisdiction and asserted that Plaintiff had not sufficiently alleged the existence of tortious conduct or a relationship that would support Plaintiff's new claim of conspiracy jurisdiction. Rating Agencies responded to the new claim of unjust enrichment by asserting that the claim must be dismissed because Plaintiff failed to allege that it had a sufficiently direct relationship with Rating Agencies and because Plaintiff failed to allege that Rating Agencies received a benefit from Plaintiff.

Plaintiff filed briefs in opposition to the motions to dismiss, asserting that dismissal was inappropriate at this stage of the proceedings. Plaintiff attached affidavits from John C. Spracher, Alan G. Stahl, and Adam L. Henry in support of the opposition to the motions to dismiss for lack of personal jurisdiction. Mr. Spracher, senior vice president for Plaintiff,

attested that he had been tasked with soliciting prospective investments and making purchase recommendations to Plaintiff's management committee. He explained that during his tenure in that position, he had a longstanding working relationship with SunTrust and with FTN through Eddie Murphey, FTN's senior vice president. He claimed that Mr. Murphey was aware of Plaintiff's investment policies and procedures. He asserted that FTN marketed the PreTSLs to him at various seminars held in Memphis and in Roanoke, Virginia. He stated,

> Based upon the sales pitches on the PreTSL products made by FTN both primarily at the seminars in Memphis, Tennessee and by phone calls made to me by Eddie Murphey, I recommended to [Plaintiff's committee] to purchase the PreTSL[s.]

He related that he purchased the PreTSLs for Plaintiff through "phone conversations [with] Eddie Murphey in Tennessee." After purchasing the PreTSLs, he selected Trapeza and Soloso for purchase. He asserted that in purchasing Soloso, he corresponded with Anna White, who was "based in the Memphis, Tennessee office of Bear Stearns" and that he ultimately purchased Soloso from Bear Stearns through phone conversations with Ms. White in Tennessee. He further stated that prior to Plaintiff's purchase of RAST, "Merrill Lynch made an in-person presentation to [Plaintiff's] investment management team."

Mr. Stahl attested that he examined publicly available information and found that in February 2012, Moody's issued 11 rating actions for Tennessee governmental bond issuers. He further stated, in pertinent part, "Moody's issue[d] credit ratings on approximately 150 Tennessee governmental bond issues annually." Relative to Fitch, he found that "[f]rom October 2007 to September 2011, Fitch derived 1.1 [percent] of its United States income and 0.5 [percent] of its global income from rating the securities of issuers based in Tennessee." He likewise found that Fitch employees had traveled to Tennessee approximately 48 times per year from 2007 to 2010 and that "Fitch generated $3,286,000 in revenue in 2010 from rating the securities of issuers based in Tennessee." Relative to McGraw-Hill, he found that "McGraw-Hill, through S&P, ha[d] issued ratings on approximately 550 Tennessee governmental, quasi-governmental and corporate bond issues." He also found that McGraw-Hill maintained an office branch in Memphis.

Mr. Henry related that he examined publicly available information and found that FTN, KBW, Morgan Keegan, SunTrust, JP Morgan, and Merrill Lynch were registered as brokers with the Securities and Exchange Commission and with Tennessee. He also found that Mr. Murphey, who marketed the PreTSLs, and Drew Hearon, who marketed RAST, were registered brokers in Tennessee. He claimed that the PreTSLs "were to be offered through solicitations by [FTN] and/or KBW in all fifty states" and that Soloso "was to be offered through solicitations by Bear Stearns in all fifty states." Relative to Rating Agencies, he claimed that Moody's rated a City of Knoxville debt issuance, Fitch rated a State of

Tennessee debt issuance, and that McGraw-Hill, while doing business as S&P, maintained a list of hundreds of Tennessee municipal bonds that it rated.

Following a hearing on the various motions before the trial court, the court stated,

[P]laintiff has furnished some affidavits in response to the [motions to dismiss for lack of jurisdiction], but the [c]ourt is constrained to conclude that [] Plaintiff has not established such a prima facie case that it should be permitted at this point to inquire by discovery further about the personal jurisdiction defense, and so this [c]ourt most respectfully denies that implicit request which is in [P]laintiff's motion for a status conference and sustains those motions filed by defendants for either protective orders or to quash that issue.

The court ultimately held that it did not have personal jurisdiction over Nonresident Defendants. Applying Tennessee law, the court found that Plaintiff's claims were time-barred. In finding that the claims were time-barred, the trial court stated,

[In 2006, Congress] passed comprehensive legislation [concerning rating agencies]; in 2007[,] there was considerable public notoriety about the role of rating agencies and whether or not they were laboring under conflicts of interest and engaged in other wrongdoing; [] the rating agencies in this case [re-rated or issued downgrades for Plaintiff's securities]; [in 2007,] the Wall Street Journal wrote at length about the very problems that are the basis of [this] lawsuit; and [in July 2008, Congress] released a report . . . that called attention to all of these problems. And I just really cannot see how anybody that was in charge of investments at a banking institution could have not been aware of all of these problems by at least July of 2008.

The trial court ruled that Plaintiff filed suit "more than two years and indeed more than three years after [Plaintiff] knew or should have known these problems" and that "the pleadings in this case reveal[ed] that the common-law actions and the statutory action are barred by the two-year and three-year statute of limitations." The court also held that any statutory law claims relating to the 2003 PreTSL transactions were barred by TSA's five-year statute of repose. In the event of further appellate review, the court found that Plaintiff failed to plead its fraud claims with particularity, and that Plaintiff failed to state a claim for negligent misrepresentation, constructive fraud, and violations of the TSA. The court further found that the non-fraud claims against Rating Agencies were preempted by the CRARA and that Plaintiff's complaint did not support a claim of unjust enrichment. The court declined to rule on the issue of loss causation. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised by Plaintiff on appeal as follows:

A.   Whether the trial court erred in dismissing the complaint against Nonresident Defendants for lack of personal jurisdiction.

B.  Whether the trial court erred in dismissing the complaint for failure to state a claim upon which relief could be granted.

C.  Whether the trial court erred in holding that the non-fraud claims against Rating Agencies were preempted by the CRARA.

Rating Agencies also raised an issue on appeal that we consolidate and restate as follows:

D.  Whether Plaintiff's non-fraud claims were barred by the First Amendment to the United States Constitution.

## III.  STANDARD OF REVIEW

This appeal presents legal issues.  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness.  *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

# IV. DISCUSSION

## A.

Plaintiff asserts that the trial court erred in prohibiting discovery and in dismissing the complaint for lack of personal jurisdiction. Nonresident Defendants respond that the trial court did not err.

The trial court dismissed the amended complaint for lack of jurisdiction pursuant to Rule 12.02(2) of the Tennessee Rules of Civil Procedure. A trial court's decision to dismiss for lack of personal jurisdiction presents a question of law. Tenn. R. Civ. P. 12.02(2). For the purpose of determining whether a plaintiff established a prima facie showing of personal jurisdiction over a defendant, we review the trial court's decision de novo, with no presumption of correctness. *JRM Invs., Inc. v. Nat'l Standard, LLC*, No. W2011-01143-COA-R3-CV, 2012 WL 1956421, at *2 (May 31, 2012). In reviewing a trial court's decision to grant a motion to dismiss for lack of personal jurisdiction, we must take the plaintiff's allegations of fact as true. Tenn. R. App. P. 13(d).

When "a defendant supports its motion [to dismiss for lack of jurisdiction] with affidavits, the plaintiff must establish its prima facie showing of personal jurisdiction over the defendant by filing its own affidavits or other written evidence." *Gordon*, 300 S.W.3d at 644 (citing *Chenault v. Walker*, 36 S.W.3d 45, 56 (Tenn. 2001); *Mfrs. Consol. Serv., Inc. v. Rodell*, 42 S.W.3d 846, 854-55 (Tenn. Ct. App. 2000)). "Dismissal is proper only if all the specific facts alleged by the plaintiff collectively fail to establish a prima facie case for personal jurisdiction." *Id.* (citing *Rodell*, 42 S.W.3d at 855). "A trial court must take as true all the allegations in the plaintiff's complaint and supporting papers, if any, and must resolve all factual disputes in the plaintiff's favor." *Id. (citing Chenault*, 36 S.W.3d at 56; *Rodell*, 42 S.W.3d at 855). In complex cases, the trial court may allow for jurisdictional discovery, hold an evidentiary hearing, or hold the motion in abeyance until a trial on the merits has been completed. *See State v. NV Sumatra Tobacco Trading Co.*, - - - S.W.3d - - -, 2013 WL 1248285, at *10 (Tenn. March 28, 2013) (citing *Gordon*, 300 S.W.3d at 644).

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Personal jurisdiction over non-residents is governed by Tennessee's long-arm statutes, which "derive their scope from the Tennessee and Federal Constitutions." *Sumatra*, 2013 WL 1248285, at *11; *see* Tenn. Code Ann. § 20-2-225. Tennessee "adopted the 'minimum contacts' test for determining when the courts of this state may exercise personal jurisdiction over a nonresident defendant." *Rodell*, 42 S.W.3d at 855. Personal jurisdiction may only be exercised if the nonresident defendant

has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This two-part test requires evaluating whether the requisite minimum contacts are present and whether the exercise of jurisdiction is fair. *Burger King*, 471 U.S. at 476; *Davis Kidd Booksellers, Inc. v. Day-Impex, Ltd.*, 832 S.W.2d 572, 575 (Tenn. Ct. App. 1992). In accordance with the two-part test, Tennessee recognizes the doctrines of general, specific, and conspiracy jurisdiction. *Gordon*, 300 S.W.3d at 647; *Chenault*, 36 S.W.3d at 54-55.

1. General Jurisdiction

Plaintiff asserts that it presented a prima facie showing of the trial court's general, all-purpose jurisdiction over Issuing Entities, TCM, and Rating Agencies.[9] Nonresident Defendants respond that Plaintiff cannot establish the applicability of general jurisdiction because they did not engage in continuous, systematic activity in Tennessee that would render them "essentially at home" in Tennessee.

General jurisdiction "may be proper even when the cause of action does not arise out of the defendant's activities in the forum state." *Sumatra*, 2013 WL 1248285, at *15. State courts "may assert general jurisdiction when the defendant is 'essentially at home' in the state." *Id.* at *15 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)). "Being essentially at home means that a nonresident defendant's contacts with the forum state are 'sufficiently continuous and systematic' such that it would be fair to subject the defendant to suit in the forum state, even when the cause of action arises elsewhere." *Id.* (quoting *Goodyear*, 131 S. Ct. at 2854). Likewise, the Tennessee Supreme Court explained in *Gordon* that

> [a]n assertion of general jurisdiction must be predicated on substantial forum-related activity on the part of the defendant. The nonresident defendant's contacts with the forum state must be sufficiently continuous and systematic to justify asserting jurisdiction over the defendant based on activities that did not occur in the forum state.
>
> The general jurisdiction inquiry is very different from the specific jurisdiction inquiry. The United States Court of Appeals for the Fifth Circuit has pointed out that [u]nlike the specific jurisdiction analysis, which focuses on the cause of action, the defendant and the forum, a general jurisdiction inquiry is dispute

---

[9]TCM asserts that Plaintiff waived any issues pertaining to the court's general and specific jurisdiction. Having reviewed the pertinent documents, we conclude that the issues of general and specific jurisdiction as they related to TCM were not waived.

blind, the sole focus being on whether there are continuous and systematic contacts between the defendant and the forum. In order to warrant the exercise of general jurisdiction over a nonresident defendant, the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.

The proper analysis for determining whether a defendant's contacts are continuous and systematic enough to warrant an assertion of general jurisdiction requires ascertaining whether the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.

300 S.W.3d at 647-49 (internal citations omitted). In determining whether a nonresident's contacts are sufficient, the court must engage in a "careful, non-mechanical evaluation of the facts with particular focus on the nonresident defendant's contacts with the forum state." *Id.* (internal citations omitted).

*Issuing Entities & TCM*

Plaintiff based its claim of general jurisdiction over Issuing Entities and TCM on the following facts:

Millions of dollars of notes making up the underlying securities underlying the products were purchased in Tennessee or from Tennessee entities by Issuing Entities; the products were registered with the SEC and sold in all states, including Tennessee; Issuing Entities knew Placement Agents were located in Tennessee and knew that the products would be sold in and from Tennessee; and TCM actively traded the underlying securities, 17.6 percent of which were purchased from a region that included Tennessee, in and out of the Trapeza CDO in concert with J.P. Morgan, Morgan Keegan, and Rating Agencies.

In addition to the transaction-related activity, Plaintiff claimed that Issuing Entities were formed by Tennessee entities and that Issuing Entities issued the products back to Tennessee entities.

We acknowledge the alleged originating connection between Issuing Entities and Tennessee but cannot discount the fact that Issuing Entities were created as special purpose entities solely to complete the sale and to assist in the return on Plaintiff's investment.

-16-

Likewise, we cannot discount the fact that TCM's connection to Tennessee was limited to the transactions at issue. The contacts at issue in this case were strikingly similar to the contacts considered by the United States Supreme Court in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984).

In *Helicopteros*, survivors of United States citizens who died in a helicopter crash in Peru sought to recover damages from the Colombian corporation that owned the helicopter. 466 U.S. at 409-12. The survivors filed suit in a Texas court, asserting that the court had general jurisdiction over the corporation because of the corporation's contacts with Texas. *Id.* Notably, the corporation's contacts with Texas

> consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from Bell Helicopter for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training.

*Id.* at 416. Despite these contacts, the Court held that the citizens could not maintain their actions because the corporation's visits, helicopter purchases, and purchase-linked activity were insufficient to subject the corporation to general jurisdiction in Texas. *Id.* at 416-19.

In consideration of the foregoing, we cannot characterize the presence of Issuing Entities and TCM in the forum state as continuous and systematic. Issuing Entities and TCM never visited Tennessee, were incorporated elsewhere, and whatever revenue they derived from debts located in Tennessee paled in comparison to the revenue and purchasing activity discussed in *Helicopteros*. Accordingly, we conclude that the facts presented by Plaintiff fall short of collectively establishing a prima facie showing that the activities at issue in this case were sufficiently continuous and systematic such that it would be fair to subject Issuing Entities and TCM to suit in Tennessee even if the cause of action arose elsewhere. We affirm the trial court's refusal to permit additional discovery and the ultimate dismissal of the complaint for lack of general, all-purpose jurisdiction as to Issuing Entities and TCM.

*Rating Agencies*

Plaintiff based its claim of general jurisdiction over Rating Agencies on the following facts:

The agencies rate Tennessee's bond debt and the debt of Tennessee municipalities, governmental authorities, and corporations; the agencies are global companies that sell and distribute publications in print form and by computer services to various banks, financial institutions, libraries, and other corporations in various states, including Tennessee; the agencies sell investor related reports and publications on a daily basis to Tennessee customers; and the agencies have been authorized to transact business in Tennessee for decades.

Specifically, Plaintiff alleged that Moody's

issued 11 ratings for Tennessee governmental bond issuers in February 2012; issued credit ratings on approximately 150 Tennessee governmental bonds on a yearly basis; generated approximately $50,000,000 from activities in Tennessee on a yearly basis; and rated a Knoxville debt issuance on March 1, 2012.

Plaintiff alleged that Fitch

generated 1.1 percent of its national revenues and .5 percent of its global revenues from Tennessee transactions; generated $12,100,000 from Tennessee transactions in 2007; allowed employees to conduct business in Tennessee approximately 150 times in 3 years; and rated a Tennessee debt issuance in February 2012.

Plaintiff alleged that S&P,[10]

annually issued ratings on approximately 330 Tennessee governmental, quasi-governmental, and corporate bond issues; leased office space in Tennessee;

---

[10]Plaintiff's suit was filed against McGraw-Hill doing business as S&P. Prior to January 1, 2009, S&P was simply a unit of McGraw-Hill's financial services division. Since that time, S&P became S&P's Financial Services, LLC, a wholly-owned subsidiary of McGraw-Hill. For purposes of this case, McGraw-Hill does not allege that S&P should be treated as a wholly-owned subsidiary. *See generally Gordon*, 300 S.W.3d at 653-54 (addressing the issue of corporate separateness in considering questions of jurisdiction).

maintained a custom state share index of Tennessee companies and investments; and offered Tennessee schools a line of textbooks.[11]

Plaintiff alleged that McGraw-Hill, through S&P

maintained a list of Tennessee bonds that it rated, issued ratings on approximately 550 Tennessee governmental, quasi-governmental, and corporate bond issues; maintained an office in Tennessee; employed 48 people in Tennessee in December 2011; and generated $59,000,000 in revenue from Tennessee sales; was authorized to transact business in Tennessee; and maintained a designated agent for service of process in Tennessee.

The contacts at issue in this case simply did not rise to the level of the contacts considered by the United States Supreme Court in *Perkins v. Benguet Consolidated Mining Company*, 342 U.S. 437 (1952), the leading case on the issue of general, all-purpose jurisdiction. *See Goodyear*, 131 S. Ct. at 2856 (stating that *Perkins* remains the "textbook case" of general jurisdiction). In *Perkins*, the non-resident plaintiff sought recovery in Ohio from the Benguet Consolidated Mining Company, which had ceased operations in the Philippines during World War II and relocated to Ohio for the purpose of conducting its business activities. 342 U.S. at 438-39. Notably, the corporation's contacts with Ohio were as follows:

[The president of the company] maintained an office [in Ohio] in which he conducted his personal affairs and did many things on behalf of the company. He kept there office files of the company. He carried on there correspondence relating to the business of the company and to its employees. He drew and distributed there salary checks on behalf of the company, both in his own favor as president and in favor of two company secretaries who worked there with him. He used and maintained in Clermont County, Ohio, two active bank accounts carrying substantial balances of company funds. A bank in Hamilton County, Ohio, acted as transfer agent for the stock of the company. Several directors' meetings were held at his office or home in Clermont County. From that office he supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines and he dispatched funds to cover purchases of machinery for such rehabilitation. Thus he carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company. He there discharged his duties as president and general manager, both during the occupation of the company's properties by

---

[11] We acknowledge that some of these allegations were countered by S&P's affidavit; however, we, like the trial court, were constrained to take Plaintiff's allegations as true.

the Japanese and immediately thereafter. While no mining properties in Ohio were owned or operated by the company, many of its wartime activities were directed from Ohio and were being given the personal attention of its president in that State at the time he was served with summons.

*Id.* at 447-48. In consideration of the mining company's extensive contacts with Ohio, the Court held that the courts in Ohio were free to exercise jurisdiction over the mining company. *Id.* at 448-49.

We acknowledge that general, all-purpose jurisdiction may be exercised over a plaintiff with less than the amount of contacts considered in *Perkins*. However, "[a] corporation's 'continuous activity of some sorts' [is simply] 'not enough to support the demand that the corporation be amenable to suit unrelated to that activity.'" *Goodyear*, 131 S. Ct. at 2856 (quoting *Int'l Shoe*, 326 at 318). In this case, Rating Agencies marketed their services to Tennessee, engaged in the rating of debt issuances for Tennessee on a regular basis, and in some cases, maintained an office in Tennessee for a limited number of employees. These contacts, while establishing that Rating Agencies engaged in business with Tennessee, plainly fall short of collectively establishing a prima facie showing that the activities at issue in this case were sufficiently continuous and systematic such that it would be fair to subject Rating Agencies to suit in Tennessee even if the cause of action arose elsewhere. Accordingly, we affirm the trial court's refusal to permit additional discovery and the ultimate dismissal of the complaint for lack of general, all-purpose jurisdiction as to Rating Agencies.

## 2. Specific Jurisdiction

Plaintiff argues that the trial court erred in dismissing its complaint for lack of jurisdiction because it presented a prima facie showing of specific, case-linked jurisdiction in its response to the motions to dismiss. Nonresident Defendants respond that Plaintiff cannot establish the applicability of specific jurisdiction because they did not perform any actions in Tennessee.

Citing a footnote in *Gordon*, Nonresident Defendants also assert that Plaintiff cannot invoke specific jurisdiction because Plaintiff was a resident of Virginia, not Tennessee. The referenced footnote provides,

Another plaintiff might have been able to make a plausible claim for exercising specific personal jurisdiction over Greenview had he or she demonstrated that Greenview purposely directed its activities toward Tennessee residents and that the subject matter of the litigation related to those activities. *See Burger King []*, 471 U.S. at 472-73 []; *Masada Inv. Corp. v.*

> *Allen*, 697 S.W.2d [332, 334 (Tenn. 1985)]. This avenue was closed to Ms.
> Gordon in this case because she is a resident of Kentucky.

*Gordon*, 300 S.W.3d at 649 n. 12. While the language appears on point, specific jurisdiction was not at issue in *Gordon* because the plaintiff conceded that her claim did not arise out of the defendant's contacts with Tennessee. *Id.* Thus, any discussion regarding specific jurisdiction was mere dicta and was not binding on this court. *Rush v. Chattanooga Du Pont Emps.' Credit Union*, 358 S.W.2d 333, 336 (Tenn. 1962); *Staten v. State*, 232 S.W.2d 18, 19 (Tenn. 1950). A plaintiff's contacts with the forum state are generally irrelevant to the question of personal jurisdiction unless the contacts were "so manifold as to permit jurisdiction when it would not exist in their absence." *Calder v. Jones*, 465 U.S. 783, 788 (1984) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779-80 (1984)). However, the forum must have some interest in adjudicating the dispute. *Keeton*, 465 U.S. at 776 (upholding jurisdiction over nonresident's claim against nonresident publisher for publication of false statements in forum state).

"Specific jurisdiction exists when a defendant has minimum contacts with the forum state and the cause of action arises out of those contacts." *Sumatra*, 2013 WL 1248285, at *15. The Due Process Clause precludes jurisdiction unless "individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign.'" *Burger King*, 471 U.S. at 472 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977)). Requiring fair warning "'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The "requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* (internal citations and quotations omitted).

In instructing courts how to assess a defendant's minimum contacts with the forum state, the Tennessee Supreme Court provided,

> The first step is the fact-gathering exercise of identifying the relevant contacts. The plaintiff is required to establish that minimum contacts exist by a preponderance of the evidence. The court should consider the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts. A defendant's contacts are sufficiently meaningful when they demonstrate that the defendant has purposefully targeted Tennessee to the extent that the defendant should reasonably anticipate being haled into court here.

*Sumatra*, 2013 WL 1248285, at \*30. In this case, Plaintiff was merely required to make a prima facie showing of personal jurisdiction because the court limited evidence to the affidavits submitted on the issue. *See generally Gordon*, 300 S.W.3d at 644 (discussing the standard of review of a Rule 12.02 motion to dismiss).

Plaintiff asserted that Defendants "purposefully established numerous specific points of contact with Tennessee and [that Plaintiff's] causes of action arose from [the] activities [that were] related to Tennessee." According to Plaintiff, Issuing Entities and Rating Agencies worked with Tennessee entities in the selection and structuring of the underlying assets comprised in the various products. TCM actively traded the underlying assets that included debt derived from Tennessee residents, and Issuing Entities were formed by Tennessee entities. Plaintiff claimed that the products were sold in various states, including Tennessee and that the products sold by Issuing Entities and rated by Rating Agencies included underlying debt derived from Tennessee entities.

In this case, the connection of the structuring, rating, and marketing of the products to the cause of action could not be greater. Tennessee entities, through Issuing Entities and TCM, were intricately involved in the marketing and sale of the products. Rating Agencies also worked with Tennessee entities to rate the products at issue. Despite such a connection, the contacts at issue were not sufficiently meaningful to support the invocation of specific jurisdiction. The products *in this case* were marketed to a sophisticated investor, not residents of Tennessee or even other Tennessee entities. Defendants in this case targeted Plaintiff, a banking and financial services company that was not even incorporated in Tennessee. While Tennessee residents who bank with Plaintiff may encounter residual effects of Plaintiff's losses, the record is simply devoid of any evidence that would establish that Nonresident Defendants "purposefully targeted Tennessee" in this case and "should reasonably anticipate being haled into court here" for their actions in this case. Accordingly, we affirm the trial court's refusal to permit additional discovery and the ultimate dismissal of the complaint for lack of specific, case-linked jurisdiction as to Nonresident Defendants.

### 3. Conspiracy Jurisdiction

The Tennessee Supreme Court adopted the doctrine of conspiracy jurisdiction in *Chenault*. 36 S.W.3d at 55. The doctrine provides that when,

(1) two or more individuals conspire to do something,

(2) that they could reasonably expect to lead to consequences in a particular forum, if

-22-

(3) one co-conspirator commits overt acts in furtherance of the conspiracy, and

(4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state,

then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum.

*Id.* at 53 (quotation omitted).

As an initial matter, we must address whether the fourth prong of the test was satisfied. The fourth prong of the conspiracy jurisdiction test was "designed to meet the strictures of the 'minimum contacts' test." *Id.* at 56-57. Tennessee's adoption of conspiracy jurisdiction was intended to support the exercise of jurisdiction over defendants who engaged in a conspiracy to harm Tennessee residents but lacked the requisite minimum contacts to support personal jurisdiction in Tennessee. When a court upholds a request for conspiracy jurisdiction, the resident defendant's actions and contacts with the forum state are imputed to the nonresident defendant, thereby supporting the exercise of jurisdiction despite a lack of minimum contacts with the forum state. *See id.* at 53-54 ("[I]n the abstract we find nothing explicit or implicit in these constitutional principles that would prohibit the exercise of jurisdiction based on the imputation of a co-conspirator's minimum contacts. To the contrary, we think that the conspiracy theory follows plainly from the very definition of conspiracy and the meaning of co-conspirator liability: the acts of a conspirator in furtherance of an illegal agreement with his co-conspirator are attributed to that co-conspirator."). In *Chenault*, the Tennessee Supreme Court imputed a resident's contacts with Tennessee to nonresidents, who purposefully targeted a Tennessean in an alleged civil conspiracy to commit fraud. *Id.* at 56-58.

In this case, Nonresident Defendants do not lack minimum contacts with Tennessee. Their contacts were simply not meaningful enough to support the invocation of specific jurisdiction. Imputing additional contacts to them would not subject them to personal jurisdiction under the long-arm statute of this state when the record is devoid of evidence that they "purposefully targeted Tennessee" to the extent that they "should reasonably anticipate being haled into court here." As previously stated, the products in this case were marketed to a sophisticated investor incorporated in Virginia, not residents of Tennessee or even other Tennessee entities. With these considerations in mind, we affirm the trial court's refusal to permit additional discovery and the ultimate dismissal of the complaint for lack of conspiracy jurisdiction as to Nonresident Defendants. Having concluded that the trial court did not have

general, specific, or conspiracy jurisdiction over Nonresident Defendants, we further conclude that the trial court did not err in dismissing the claims against them.

B.

While the trial court lacked jurisdiction over Nonresident Defendants, FTN, KBW, Morgan Keegan, SunTrust, BOA as successor in interest to Merrill Lynch, and JP Morgan, individually and as successor in interest to Bear Stearns conceded jurisdiction. The trial court dismissed the amended complaint against them for failure to state a claim pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure. A Rule 12.02(6) motion for failure to state a claim upon which relief can be granted "challenges only the legal sufficiency of the complaint, not the strength of the proof[;] therefore, matters outside the pleadings should not be considered in deciding whether to grant the motion." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn. 2002).

In dismissing Plaintiff's complaint, the trial court considered publicly available reports, newspaper articles, and the offering circulars relating to each transaction at issue. Rule 12.03 of the Tennessee Rules of Civil Procedure provides,

> If, on a motion [to dismiss], matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rules 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The Tennessee Supreme Court held this general rule inapplicable when the motion is one involving jurisdictional issues. *See Nicholstone Book Bindery, Inc. v. Chelsea House Publishers*, 621 S.W.2d 560, 561 n. 1 (Tenn. 1981). Such is not the case when the motion is one involving the insufficiency of the claim. Exceptions to the general rule allow

> consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment.

*Indiana State Dist. Council of Laborers v. Brukardt*, No. M2007-02271-COA-R3-CV, 2009 WL 426237, at *8 (Tenn. Ct. App. Feb. 19, 2009) (quoting Wright and Miller, Federal Practice and Procedure, Civil § 1357, p. 376 (3d ed. 2004)), *perm. app. denied* (Tenn. Aug. 24, 2009). The trial court in this case considered and relied upon newspaper articles, which were not subject to judicial notice. Plaintiff complains on appeal that the materials relied

upon by the trial court in dismissing its claims as time-barred were not "necessarily comprehensive or even on point with the issues." The record was replete with extraneous information that was presented to the court, was not explicitly excluded from consideration, and was ultimately referenced in the court's decision. The motion should have been treated as one for summary judgment, and the parties should have been given "reasonable opportunity to present all material made pertinent to such a motion." Tenn. R. Civ. P. 12.02.

Ordinarily, this court would simply review the dismissal using the standards applicable to summary judgment. This case presents a "procedural anomaly of sorts" because "no statement of undisputed material facts" exists for this court's consideration. *Chambers*, 2011 WL 3241836, at *5. Plaintiff was also not given the opportunity to offer additional proof on the non-jurisdictional issues in the form of affidavits or other discovery materials, thereby impeding its ability to show that there was a genuine issue for trial pursuant to Rule 56 of the Tennessee Rules of Civil Procedure. Additionally, this is a case of extreme complexity that involves numerous defendants and varying claims for relief. With these considerations in mind, we remand this case to the trial court for purposes of allowing the parties an opportunity to engage in discovery in accordance with Rule 56 of the Tennessee Rules of Civil Procedure prior to the trial court's ruling on the issue. *See generally Int'l Merch. Servs., Inc. v. ATM Cent., LLC*, No. W2003-00849-COA-R3-CV, 2004 WL 170392, at *4-5 (Tenn. Ct. App. Jan. 27, 2004) (reversing the trial court's dismissal and allowing the parties to engage in limited discovery for purposes of Rule 56).

C.

Plaintiff argues that the trial court erred in holding that its non-fraud claims against Rating Agencies were preempted by the CRARA. Having concluded that the trial court did not have jurisdiction over Rating Agencies, this issue is pretermitted.

D.

Citing *Sutton v. Stolt-Nielsen Transportation Group, Limited*, No. E2008-01033-COA-R3-CV, 2009 WL 499521, at *3 (Tenn. Ct. App. Feb. 27, 2009), Rating Agencies ask this court to consider whether Plaintiff's non-fraud claims were barred by the First Amendment to the United States Constitution even though the issue was not addressed by the trial court in the proceedings below. Having concluded that the trial court did not have jurisdiction over Rating Agencies, this issue is pretermitted.

**V. CONCLUSION**

The judgment of the trial court is affirmed as to the court's ruling that it did not have personal jurisdiction over Moody's Investor Services, Inc.; Fitch, Inc. doing business as Fitch Ratings; The McGraw-Hill Companies, Inc. doing business as Standard & Poor's Ratings

Services; Trapeza Capital Management, LLC; Preferred Term Securities X, Inc.; Preferred Term Securities X, Ltd.; Preferred Term Securities XII, Inc.; Preferred Term Securities XII, Ltd.; Preferred Term Securities XIII, Ltd.; Preferred Term Securities XIV, Inc.; Preferred Term Securities XIV, Ltd.; Preferred Term Securities XVI, Inc.; Preferred Term Securities XVI, Ltd.; Preferred Term Securities XXII, Inc.; Preferred Term Securities XXII, Ltd.; Preferred Term Securities XXII, Inc.; Preferred Term Securities XXIII, Ltd.; Preferred Term Securities XXVI, Inc.; Preferred Term Securities XXVI, Ltd.; Soloso CDO 2007-1, Inc.; Soloso CDO 2007-1, Ltd.; Trapeza CDO XIII, Inc.; and Trapeza CDO XIII, Ltd.

The judgment of the trial court is reversed as to the court's ruling that Plaintiff failed to state a claim against First Tennessee Bank, N.A. doing business as FTN Capital Markets; FTN Financial Securities Corporation; Keefe, Bruyette & Woods, Inc.; SunTrust Robinson Humphrey, Inc. formally known as SunTrust Capital Markets, Inc.; Morgan Keegan & Company, Inc.; J.P. Morgan Securities, LLC, individually and as successor in interest to Bear Stearns & Company, Inc.; and Bank of America Corporation as successor in interest to Merrill Lynch, Pierce, Fenner & Smith, Inc.

The case is remanded for further proceedings consistent with this opinion. Costs of the appeal are taxed one-half to the appellant, First Community Bank, formally known as First Community Bank, N.A. and one-half to the appellees, First Tennessee Bank, N.A. doing business as FTN Capital Markets; FTN Financial Securities Corporation; Keefe, Bruyette & Woods, Inc.; SunTrust Robinson Humphrey, Inc. formally known as SunTrust Capital Markets, Inc.; Morgan Keegan & Company, Inc.; J.P. Morgan Securities, LLC, individually and as successor in interest to Bear Stearns & Company, Inc.; and Bank of America Corporation as successor in interest to Merrill Lynch, Pierce, Fenner & Smith, Inc.


_____
JOHN W. McCLARTY, JUDGE